**GARY R. SCOTT**
**AMANDA M. GOOD**
HIRST APPLEGATE, LLP
1720 Carey Avenue, Suite 200
P. O. Box 1083
Cheyenne, WY 82003
(T) 307-632-0541
Fax 307-632-4999

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF WYOMING

TETON MILLWORK SALES. a Wyoming
corporation.

        Plaintiff,

        vs.

ROGER SCHLOSSBERG,

        Defendant.

Civil No. 07-CV-014J

# *MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

## *BACKGROUND AND ALLEGATIONS*

Plaintiff's Complaint arises out of a divorce action instituted by Mary Palencar against Michael Palencar (Palencar) in the Family Court of Jefferson County, West Virginia. Civil Action No. 02-D-3 (the Divorce Proceedings). The Complaint alleges that Defendant Roger Schlossberg (Schlossberg) was appointed by the Family Court of Jefferson County (the Family Court) in the Divorce Proceedings as a trustee, and then subsequently as a special receiver. It is alleged in the Complaint that in January and February of 2004

Schlossberg made false representations to "agents and associates" of Teton Millwork Sales (Teton) in his attempts to take possession of assets of Palencar, which misrepresentations allegedly resulted in those agents providing to Schlossberg confidential and proprietary information concerning Teton. Teton asserts in its Complaint causes of action for abuse of process and for fraud. The Complaint references Orders issued by the Family Court concerning the appointment of Schlossberg as receiver/special trustee, and the authority given to Schlossberg by the Family Court. Copies of the Orders issued by the Family Court concerning Schlossberg were earlier filed with Defendant's Motion to Dismiss. Also, the more relevant Orders are attached to the Affidavit of Roger Schlossberg filed herewith.

The Family Court Orders generally show that Palencar during the Divorce Proceedings was in contempt of those proceedings. Palencar failed to appear for his own deposition which had been noticed, failed to provide an accounting of his assets as had been ordered by the Family Court, sold assets in violation of the Family Court Orders, failed to provide proceeds from a real estate transaction as had been ordered by the Family Court, failed to post a cash bond with the Clerk as had been ordered by the Family Court, failed to adequately respond to written discovery that was served upon him, failed to contribute to the cost of remodeling the couple's home as had been ordered, and "totally failed to cooperate with discovery and provide financial disclosure." The Orders show that because of that, the Family Court appointed Schlossberg as a trustee, and subsequently as a special receiver in order to take possession and control of Palencar's assets so that those assets could be

distributed in accordance with Family Court Orders. The Orders indicate that it was the intention of the Family Court to vest Schlossberg with the broadest possible powers that a trustee or receiver can have.

Eventually, partly due to the efforts of Schlossberg as a mediator, the Divorce Proceedings concluded with a resolution. At a hearing held on 26 March 2004 the Family Court approved the Palencars' written settlement agreement. At that time the Family Court expressly retained jurisdiction "over any and all claims asserted by either party or by any person or entity arising from or related to the alleged performance or non-performance by Roger Schlossberg of his duties as Trustee or as Special Receiver in this action." Schlossberg at that time was ordered to pay over to Palencar all of the net funds remaining in Schlossberg's custody or control, less the sum of $35,000 in approved fees, subject to further Order of the Family Court. (Order of 14 May 2004.)

Subsequent to the Palencars' divorce settlement, Palencar filed a Petition for Contempt against Schlossberg, which was heard by the Family Court on 4 November 2004. The Family Court heard testimony and took evidence after which the Family Court concluded that Schlossberg had "played a critical role in the ultimate resolution of equitable distribution and other matters between the parties...." The Family Court recognized that much of the rancor in the case and the pending contempt matter related to the interception of Palencar's mail by Schlossberg "pursuant to the authority granted to him by this Court." The Family Court had granted Schlossberg such broad authority because the Family Court

"found it necessary to do so due to actions of the Respondent as noted in prior orders." The Family Court concluded "by and large, Schlossberg acted diligently to honor the Order (of 14 May 2004). The Court is satisfied that he acted in good faith and the evidence does not establish that he acted in any respect in willful violation of the Order." The Petition for Contempt was denied by the Family Court. (Order Adjudicating Contempt of 15 November 2004, pages 8-10.)

Following the resolution of the divorce action, **Palencar and Teton** filed a Complaint in the Circuit Court of Jefferson County, West Virginia against the Judge who had presided over the Divorce Proceedings, the Honorable William T. Wertman, Jr., in Civil Action No. 05-C-6. (Schlossberg was not a named defendant.) In that Complaint the Plaintiffs alleged that Judge Wertman had acted outside of his jurisdiction and outside of his authority by authorizing the unlawful interception and seizure of Plaintiffs' mail and for his unlawful exercise of jurisdiction and dominion over the property of Teton. It was alleged in that Complaint that Schlossberg, based upon unlawful orders that had been signed by Judge Wertman, seized the mail of the Plaintiffs and the personalty of Teton, and that as a result the Plaintiffs had been injured and had suffered damages. It was alleged in that Complaint that Judge Wertman had made findings in the Divorce Proceedings which the Judge knew or should have known were inconsistent "with the true facts of the case...." (Complaint, Civil No. 05-C-6.)

On or about 26 July 2005 Plaintiffs' Complaint in Civil Action No. 05-C-6 was dismissed with the Circuit Court finding that a judge, when acting in his judicial capacity, is immune from civil liability for any and all official acts. The Circuit Court also found that under statutory authority granted to family courts in West Virginia, Judge Wertman "had the authority to enter orders pertaining both to the preservation of property incident to a divorce and to collection of judgments entered in the course of the divorce proceedings." The Circuit Court, in regard to Teton, found that the orders that had been entered by Judge Wertman explained why Teton's property had been affected. The Circuit Court found that the fact that Teton was not a party to the Divorce Proceedings was of no consequence as to whether Judge Wertman's acts were "judicial." (Order Granting Motion to Dismiss.)

## *PROCEDURAL HISTORY OF THIS CASE*

Following the Dismissal of its Complaint in Civil No. 05-C-6, Teton, on 8 December 2006, filed its Complaint in the District Court for the Second Judicial District, Albany County, Wyoming Civil Action No. 30179. The action was removed by Defendant to this Court.

On 19 January 2007 Defendant filed its Motion to Dismiss herein. In that Motion Defendant argued that Schlossberg was entitled to absolute immunity as a court-appointed trustee or receiver; that Teton's actions were barred by the applicable statute of limitations; that this Court lacked personal jurisdiction over Schlossberg; and that this Court

lacked subject matter jurisdiction under the Full Faith and Credit provision of the United States Constitution and under 28 U.S.C. § 1738. Subsequently Defendant argued that this Court lacked subject matter jurisdiction based upon the Barton Doctrine. On 12 October 2007 this Court entered its Order Granting Defendant's Motion to Dismiss. This Court noted in its Order that each of the Defendant's arguments had validity and merited serious consideration, but the Court granted the Defendant's Motion solely on the basis of lack of personal jurisdiction and absolute immunity. The other arguments of the Defendant were otherwise not addressed or ruled upon by this Court at that time.

Plaintiff appealed the dismissal, and during the course of that appeal Schlossberg waived personal jurisdiction. On 10 February 2009 the United States Court of Appeals for the Tenth Circuit issued its Order and Judgment, which in a two to one decision, remanded the matter back to this Court for proceedings consistent with the Order and Judgment. In that Order the Tenth Circuit discussed the application of the Barton Doctrine concluding that it had subject matter jurisdiction. It should be noted that the Tenth Circuit's discussion of the Barton Doctrine was sua sponte, and that subject matter jurisdiction, including the application of the Barton Doctrine, was not briefed by the parties since lack of subject matter jurisdiction was not a basis for this Court's earlier dismissal of the Complaint. Although the Tenth Circuit discussed the application of the Barton Doctrine, there was no briefing of or discussion by the Court of lack of subject matter jurisdiction based upon Full Faith and Credit.

In regard to immunity, the Tenth Circuit was of the opinion that if the allegations of Plaintiff's Complaint were taken as true then those allegations were sufficient to defeat Defendant's Motion to Dismiss since the Complaint alleges that Schlossberg exceeded the scope of his authority in seizing the assets of Teton. Referencing the Family Court's Order of 14 January 2004 the Tenth Circuit indicated that that court order "did not grant Mr. Schlossberg authority to seize assets that did not belong to Mr. Palencar." The Tenth Circuit concluded that, "[i]f Mr. Schlossberg did not simply seek to secure Mr. Palencar's assets but rather sought to take the assets of TMS (Teton) absent any colorable evidence to justify piercing the corporate veil of TMS in such a fashion, then he exceeded the scope of his authority by not acting in accordance with the court order and would not enjoy absolute immunity." Most importantly, the Court noted that its opinion and its analysis did not resolve the issue as to whether Schlossberg will ultimately enjoy immunity, noting that in this case whether or not absolute immunity is available to Schlossberg should be determined "once the parties have had the opportunity to develop the facts through discovery."

Since the Defendant initially filed his Motion to Dismiss, the depositions of Roger Schlossberg, Michael Palencar, and Joseph Palencar (father of Michael and officer, director, and shareholder of Teton) have been taken and written discovery has been concluded. The facts developed through that discovery as well as the relevant law show that Defendant is entitled to judgment on the basis of this Court lacking subject matter

jurisdiction under Full Faith and Credit, on the basis of absolute immunity, and based upon the applicable statute of limitations. Finally, Defendant is entitled to summary judgment on Plaintiff's claim of punitive damages.

## *ARGUMENT*

### *ABSOLUTE IMMUNITY*

The Tenth Circuit in its Order and Judgment recognized that it is well established that judges and judicial officials, including court appointed receivers and trustees enjoy absolute immunity for acts performed in their official capacities. The Tenth Circuit stated that a court appointed receiver has absolute immunity if he is "faithfully carrying out the appointing judge's orders." And, the receiver is entitled to immunity unless he acts "in the absence of all jurisdiction." The Tenth Circuit reversed the dismissal of the Complaint, stating that "the court (the Family Court) order did not grant Mr. Schlossberg authority to seize assets that did not belong to Mr. Palencar." (Order and Judgment, p. 12.) The Tenth Circuit then stated that if Schlossberg "sought to take assets of (Teton) absent any recoverable evidence to justify piercing the corporate veil of (Teton) in such a fashion, then he exceeded the scope of his authority...." (*Id.*) Then, as noted above, the Tenth Circuit recognized that its analysis did not resolve the question as to whether Schlossberg ultimately would be entitled to absolute immunity, a decision that should follow the parties' opportunity to develop facts through discovery. (*Id.* at 14.)

The Tenth Circuit indicated that Schlossberg could seize the assets of Teton if there was some "colorable evidence" to justify piercing the corporate veil of Teton. Discovery that has occurred since the filing of the Motion to Dismiss has disclosed the following which certainly would constitute "colorable evidence" that Teton was Palencar's alter ego.

- Michael Palencar (Palencar) as Teton's corporate representative in this case, indicated in written discovery that his father Joseph Palencar was president of Teton at the times relevant to Plaintiffs' claims (Plaintiff's Answers to Interrogatories, #3). However, Joseph Palencar in his deposition testified that he has no memory of ever being president of Teton. (Joseph Palencar Depo., p. 6.)

- Joseph Palencar has no memory of ever attending any directors or shareholder's meetings of Teton. (*Id.* at 7, 29 and 30.)

- Joseph Palencar, as president of Teton has no information as to where corporate documents might be. (*Id.* at 16.)

- Since approximately 2000 Teton has done "nothing". It does not manufacture anything, it does not sell anything, it does not buy anything, it does not service anything, and it has no customers. Its president did not know whether or not it even had an office. (*Id.* at 20, 21.)

- To the extent Teton was involved in any transactions, it would have been Michael Palencar who carried out those transactions. (*Id.* at 51, 54.)

- A Cessna aircraft was purchased by Michael Palencar. Joseph Palencar, as president of Teton initially believed that the aircraft was owned by Michael. Michael has told his father that the aircraft was actually owned by Teton. Therefore Joseph Palencar now believes that Teton owned that Cessna aircraft. However, Joseph has no explanation as to why Michael would need an aircraft for Teton's business; there is no good reason why Teton would ever own a plane; the purchase of the aircraft was not authorized by Teton; the use of the aircraft by Michael was not authorized by Teton, and Michael is the only shareholder or director within Teton who has a pilot's license. (*Id.* at 25, 26, 27, 46, 47, 57.)

- Although Michael indicted that Teton had loaned him money on a couple of occasions, Joseph Palencar as president of the company was not aware that that had ever been done. (*Id.* at 41; Plaintiff's Answers to Interrogatories, #7.)

- The physical address of Teton is a bed and breakfast owned by Michael Palencar and his wife, in Friendsville, Maryland. (Joseph Palencar Depo., pp. 28, 29.)

- Michael Palencar is a director of Teton and is Teton's representative for this lawsuit, and is the person who knows the most about any transactions of Teton. (Michael Palencar Depo., pp. 17, 19, 20.)

- Michael Palencar calls himself the "manager" of Teton, but he does not remember any corporate meeting or corporate resolution when that was decided. (*Id.* at 20, 67, 68, 69.)

HIRST APPLEGATE, LLP
LAW OFFICES
1720 CAREY AVENUE, SUITE 200
P.O. BOX 1083
CHEYENNE, WYOMING 82003-1083

- Palencar believes that his father is now president of Teton. Palencar was president himself at one time, but does not know when that changed, or why that changed. (*Id.* at 48, 62, 64.)

- Michael Palencar handled the checkbook for Teton. (*Id.* at 47.)

- Palencar remembers meeting with his dad in Wyoming to hire a law firm to sue Schlossberg in this case. Otherwise Palencar does not recall any prior meetings of the corporation that may have been held. (*Id.* at 65, 66, 67.)

- Teton has never had any paid employees. (*Id.* at 75.)

- Since 2003 Teton's principal office has been Palencar's house in Friendsville, Maryland. (*Id.* at 48, 49, 142, 143.)

- At one point Teton did have a post office box, but later Teton's mail was forwarded directly to Palencar, wherever Palencar was. (*Id.* at 76.)

- Since 2003 Teton's records have been kept at Palencar's home in Friendsville, Maryland. (*Id.* at 51.)

- Palencar initially testified that it was he and his dad who decided to sue Judge Wertman following the conclusion of the Divorce Proceedings. He later indicated that he may have made that decision as "manager" of Teton. (*Id.* at 91, 92.) Joseph Palencar however testified he was not involved in the suit against Judge Wertman. (Joseph Palencar Depo., p. 6.)

- Teton apparently was in the practice of preparing minutes of Shareholder's Meetings that did not occur. The "Corporate Notebook" of Teton contains minutes of shareholder's meetings signed by Palencar as president for the years 1996-2001. That Notebook contains no minutes of any purported meeting occurring after 8 January 2001. (Plaintiff's Rule 26 Discovery, documents pp. 1132-1164 which constitute the "Corporate Notebook.") Neither Palencar nor his father could recall the corporate meetings that are referenced in the Minutes.

- Teton loaned Palencar and his other corporations money. Palencar carried out those transactions for Teton as its "manager," believing that no corporate authorization was required for loans to him. That belief of Palencar is inconsistent with Teton's By-Laws that indicate that no loans shall be given unless "authorized by a resolution of the Board of Directors." (Plaintiff's Rule 26 Submission, p. 1139.) To the extent any documents exist relating to those loans, those would be at Palencar's home. (Michael Palencar Depo., pp. 43, 45, 53, 54, 57, 58, 59, 60.)

- Teton purchased a Cessna aircraft in 2001, and traded it in on a Piper aircraft in 2004. (It was the Cessna that was seized by Schlossberg.) Palencar claims that the Cessna was owned by Teton. The FAA registration documents show it being owned by Palencar. Palencar claims that the registration is wrong, and his

signature on the FAA registration is a forgery.  (*Id.* at 30, 31, 32, 33, 115, 116, 119.)

- Palencar does not recall there being any discussions with the other shareholders concerning the purchase of the Cessna, and other shareholders were not involved in the transaction. Palencar signed the check for the plane on behalf of Teton and he got the plane registered. The purchase of the aircraft was made using Teton's funds.  (*Id.* at 33-36.)

- Palencar was the only person within Teton who had a pilot's license, and no one else used the plane.  (*Id.* at 35, 36.)

- Palencar used the plane for pleasure, and other business, but not for Teton's business.  (*Id.* at 36-40.)

- Palencar asserts that some of the accounts seized by Schlossberg were owned by Teton.  (*Id.* at 108-111.)

- Following Schlossberg's account to the Family Court Schlossberg was ordered to pay to Michael Palencar the value of the liquidated, seized assets ($87,852.23), less Schlossberg's approved fee of $35,000.  Schlossberg paid to Palencar's attorney Robert A. Aitcheson the amount of $52,852.23.  (Schlossberg Affidavit filed herewith.)  Palencar received that amount from Aitcheson.  However, Palencar did not inform anyone at Teton that he had received that money,

believing he had no obligation to do so.  (Michael Palencar Depo., pp. 106, 112, 113, 145.)

- Palencar used that money which was in part money from liquidated assets of Teton for his personal use.  He spent that money on himself, with none of that money being returned to Teton or being used for Teton's benefit.  (*Id.* at 112.)

Courts examine the following factors when determining whether a unity of interest exists such that the corporate entity should be disregarded:

[1]     commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses;

[2]     the treatment by an individual of the assets of the corporation as his own;

[3]     the failure to obtain authority to issue or subscribe to stock;

[4]     the holding out by an individual that he is personally liable for the debts of the corporation;

[5]     the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities;

[6]     the identical equitable ownership in the two entities;

[7]     the identification of the equitable owners thereof with the domination and control of the two entities;

[8]     identification of the directors and officers of the two entities in the responsible supervision and management: the failure to adequately capitalize a corporation: the absence of corporate assets. and undercapitalization:

[9]     the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation:

[10]    the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities;

[11]    the disregard of legal formalities and the failure to maintain arm's length relationships among related entities:

[12]    the use of the corporate entity to procure labor, services or merchandise for another person or entity;

[13]    the diversion of assets from a corporation by or to a stockholder or other person or entity. to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another:

[14]    the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions:

[15]    and the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Kaycee Land & Livestock v. Flahive*, 46 P.3d 323, 325 (Wyo. 2002)

The evidence disclosed through discovery, including the depositions of Michael and Joseph Palencar, constitutes "colorable evidence" that Teton was Michael Palencar's alter ego. It has been said that a legal entity will be disregarded when there is a unity of interest and ownership such that the corporation of the person controlling it are no longer individual or separate and to continue that adherence to the corporate fiction would sanction or promote injustice. (*Id.*) In the instant case Teton is attempting to impose liability on Schlossberg claiming that there was no basis for Schlossberg to seize the assets of Teton, and that Schlossberg was acting in the "clear absence of all jurisdiction." In accordance with the Order and Judgment because there is "colorable evidence" to justify piercing the corporate veil of Teton, Schlossberg is entitled to immunity for seizing the assets of Teton.

The Tenth Circuit in its Order makes reference to and even quotes from the Family Court's Order of 14 January 2004 which vested Schlossberg with the right to seize and to take possession of "all of the assets of . . . Michael Palencar," even if those assets were held in the name of another entity. The Tenth Circuit notes that that Court Order did not grant Schlossberg authority to seize assets that did not belong to Palencar. What is absent from the majority's opinion is any discussion of the Family Court Order of 13 February 2003 that indicates on its face that Schlossberg was to "seize any assets that (Palencar) has an ownership interest therein to make them available to meet any Order of

equitable distribution, alimony, child support, attorney's fees and suit money to be entered herein...." Subsequently the Order of 14 January 2004 referenced the February Order and confirmed that Schlossberg had been authorized to seize any assets in which Palencar had an ownership interest. By the Affidavit of Schlossberg, Schlossberg relied upon the language of these Orders when he seized assets of Palencar and Teton. It is undisputed that all of the assets seized by Schlossberg in Wyoming were either titled in the name of Palencar or in name of Teton. And it is undisputed, and it is alleged in the Complaint, that Palencar had a 25% ownership interest in Teton. Very simply, the Orders of the Family Court, and specifically the Order of 13 February gave Schlossberg the authority to seize assets of Teton, and Schlossberg did that. There is no dispute as to those material facts, and summary judgment should be granted to Defendant on the basis of absolute immunity.

The Tenth Circuit states in its Order and Judgment that the Family Court could not properly authorize Schlossberg to seize the assets of Teton if Teton was not a party to the divorce proceedings. (Order and Judgment, p. 12.) However the Tenth Circuit failed in any way to discuss the fact that Teton and Palencar had previously challenged the Family Court's authority to issue the Orders that it did concerning Teton by filing suit against Judge Wertman. That case was decided in favor of Judge Wertman in a decision that was not appealed by Teton or Palencar. Teton is now estopped from challenging the validity of the Orders of the Family Court. *Phillips v. Toner*, 133 P.3d 987, 989, 990 (Wyo. 2006).

## *STATUTE OF LIMITATIONS*

Because this is a diversity case, substantive issues are controlled by state law and procedural issues are controlled by federal law. A federal court sitting in diversity applies state law for statute of limitation purposes. *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005). And whether this Court applies the state law of West Virginia or the state law of Wyoming is determined according to which state has the most significant contacts in regard go the two claims asserted by Plaintiff.

> As an example, the analytical approach to a conflict of law question has been described within the framework of the Restatement (Second) of Conflict of Laws as follows:
>
> The Second Restatement method is constructed around the principle that the state with the most significant contacts to an issue provides the law governing that issue. *See Ingersoll v. Klein*, 262 N.E.2d at 594-95 (Ill. 1970). **A court therefore conducts a separate choice-of-law analysis for each issue in a case, attempting to determine which state has the most significant contacts with that issue.** *International Adm'rs, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir. 1985). The Second Restatement enumerates specific factors that identify the state with the most significant contacts to an issue, and the relevant factors differ according to the area of substantive law governing the issue and according to the nature of the issue itself. *See, e.g.,* Restatement (Second) at §§ 6, 145, 188. To properly apply the Second Restatement method, a court must begin its choice-of-law analysis with a characterization of the issue at hand in terms of substantive law. *Id.* at § 7. By prescribing this analytical approach, the Second Restatement follows the principle of *depecage*, which has long been applied in connection with various methods for choice of law. *See* Willis L.M. Reese, *Depecage A Common Phenomenon in Choice of Law*, 73 Colum. L. Rev. 58 (1973).

*Act I, LLC v. Davis*, 60 P.3d 145, 149 (Wyo. 2002, *citing Ruiz v. Blentech Corporation*, 89 F.3d 320, 323 (7th Cir. 1996) (emphasis supplied).

One of the Plaintiff's claims is for abuse of process. According to the Wyoming Supreme Court the tort of abuse of process is defined as "one who uses legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed, is subject to liability to the other for harm caused by the abuse of process." *Toltec Watershed Improvement District v. Johnston*, 717 P.2d 808, 810, 811 (Wyo. 1986), *citing* Restatement of Second Torts, § 682. In the instant case, what "legal process" is the basis for Teton's claim? Clearly it is the process involved in the Divorce Proceedings in West Virginia, and therefore it is West Virginia that has the most significant contacts in regard to that issue.

> Although no Kansas court has addressed the choice of law rules to be applied in abuse of process claims, the court believes the Kansas courts would follow Restatement (Second) of Conflicts of Laws § 155 (1971), which provides:
>
> The rights and liabilities of the parties for . . . abuse of process are determined by the local law of the state where the proceeding complained of occurred, unless, with respect to the particular issue, some other state ahs a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.

*American Motorists Insurance Company v. General Host Corporation*, 919 F. Supp 1506, 1513 (D.C. KS, 1996).

In regard to Plaintiff's fraud claim, the Restatement of Conflicts indicates that when the plaintiff's action in reliance upon the alleged misrepresentation took place in the forum state where the false representations were made and received, the local law of the

forum state determines the rights and liabilities of the parties, "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which the local law of the other state will be applied." Restatement of Conflicts, 2d. §148(1).

And Section 6 of the Restatement of Conflicts provides as follows:

Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

It is of significance in considering the contacts of the parties with the State of Wyoming that the Defendant who allegedly made the misrepresentations has never set foot in the State of Wyoming, and did not establish the minimum contacts necessary for this

Court to even have personal jurisdiction. And the Plaintiff has no employees in Wyoming, has no customers in Wyoming, provides no services in Wyoming, manufactures and sells nothing in Wyoming, and has not had an office or other physical presence in the State of Wyoming since 2003. On the other hand, the Defendant is a trustee appointed by a court of West Virginia, and it is an order of that West Virginia court that Defendant allegedly misrepresented. The basic underlying claim in this litigation is that Schlossberg violated and misrepresented an order issued by a West Virginia court. That West Virginia court specifically in its Order of 14 May 2004 stated that jurisdiction was being retained by it over claims asserted by any person arising out of the performance or non-performance of Schlossberg. Undoubtedly it is the State of West Virginia that has a more "significant relationship under the principle stated in § 6," and it is West Virginia law that should apply to the claim of fraud asserted by the Plaintiff since it is West Virginia's interests that are most affected. "In general, it is fitting that the state whose interests are most deeply affected should have its local law apply." *Restatement of Conflicts*, 2d § 6, comment f (1971).

In Teton's Complaint it is alleged that the Divorce Proceedings concluded on 26 March 2004. Teton's Complaint was first filed on 8 December 2006, more than two years and eight months after the Divorce Proceedings concluded. Plaintiff apparently contends that it is Wyoming's four year statute of limitations that should apply to its claim for abuse of process. That is not the case.

"If by the laws of the state or country where the cause of action arose the action is barred, it is also barred in this state." WYO. STAT. ANN. § 1-3-117. And, Teton's Complaint would be barred if it had been filed in West Virginia where the cause of action arose, since it would be a two year statute of limitations that would apply.

> Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative. West Virginia Code § 55-2-112.

It is the law of West Virginia that should apply to Plaintiffs' claims. West Virginia's two year statute of limitations bars those claims from being prosecuted before this Court, and those claims should be dismissed.

## *SUBJECT MATTER JURISDICATION*

> Full Faith and Credit shall be given in each State to the Public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by General Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof. United States Constitution, Article IV, § 1.

Properly authenticated copies evidencing the acts, records and judicial proceedings of any court of any State are to have the same full faith and credit in every court within the United States, as they have in the courts of the State from which they are taken. 28 U.S.C. § 1738. "The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal

court to give the same preclusive effect to a state-court judgment that the judgment would be given in the courts of the state in which the judgment was rendered. *Jiron v. City of Lakewood*, 392 F.3d 410, 415, 416 (10th Cir. 2004.)

The Family Court in its Order of 14 May 2004 stated that jurisdiction was being retained by the Family Court "over any and all claims asserted by either party or by any person or entity arising from or related to the alleged performance or non-performance by Roger Schlossberg of his duties as Trustee or as Special Receiver in this action." Under the Full Faith and Credit provision of the United States Constitution, and under 28 U.S.C. § 1738, that Order should be given effect by this Court.

The Full Faith and Credit Act requires federal courts to give the same deference to state court decisions that other courts of that state would be required to give those decisions. *See*, e.g., *Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997); *Jarrett v. Gramling*, 841 F.2d 354 (10th Cir. 1988); *Thournir v. Meyer*, 803 F.2d 1093 (10th Cir. 1986); *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004).

The matter at hand should be given the effect of the Full Faith and Credit Act because Teton Millworks is not being precluded from litigating its issue or claim in a collateral estoppel or res judicata context. Teton would simply be required to litigate any claim it may have against Schlossberg under the jurisdiction of the Family Court. Due to the origination of the matter in the Family Court, that court has an interest in all matters that

may arise from its judicial decisions, thus the reason for the Order expressly retaining jurisdiction.

Palencar obviously was not satisfied with the resolution of the Divorce Proceedings, and he and Teton were less than happy with the dismissal of their suit against Judge Wertman. However, Teton should not be permitted to forum shop and Teton should not be permitted to ignore the Order of 14 May 2004 issued by Judge Wertman from the Family Court. This Court should refuse to take subject matter jurisdiction of this dispute, and Plaintiff's Complaint should be dismissed.

## *PUNITIVE DAMAGES*

The Wyoming Supreme Court has defined the very narrow circumstances under which punitive damages may be awarded:

> Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits. Since the purpose of punitive damages is not to compensate a plaintiff, but to punish a defendant and deter others, such damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. . . . We have approved punitive damages in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct.

*Weaver v. Mitchell*, 715 P.2d 1361, 1369-70 (Wyo. 1986) (citation omitted) (emphasis added). Since nobody can seriously assert that this case involves an intentional tort or a tort involving malice, plaintiffs can only recover punitive damages if they establish that FSQ is guilty of willful and wanton misconduct that was a proximate cause of plaintiffs' damages.

Willful and wanton misconduct, according to the Wyoming Supreme Court,
is the "intentional doing of an act, or an intentional failure to do an act, in reckless disregard
of the consequences and under circumstances and conditions that a reasonable person would
know, or have reason to know that such conduct would, in a high degree of probability,
result in harm to another." *Id.* at 1370 (citation omitted).   Punitive damages are not
awardable in circumstances involving inattention, inadvertence, thoughtlessness, or mistake.
*Id.*; *see also Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo. 1979).

In fact, punitive damages are inappropriate even in cases involving gross
negligence, *Mayflower Rest. Co. v. Griego.* 741 P.2d 1106, 1115 (Wyo. 1987), which the
Wyoming Supreme Court has defined as:

> * * * * [I]ndifference to present legal duty and to utter forgetfulness
> of legal obligations so far as other persons may be affected. It is a
> heedless and palpable violation of legal duty respecting the rights of
> others. The element of culpability which characterizes all negligence
> is in gross negligence magnified to a high degree as compared with
> that present in ordinary negligence. Gross negligence is a manifestly
> smaller amount of watchfulness and circumspection than the
> circumstances require of a person of ordinary prudence. But it is
> something less than the willful, wanton and reckless conduct.

*Weaver,* 715 P.2d at 1370 (citation omitted) (emphasis added).  In short, gross negligence
and willful and wanton misconduct are not just different in degree, they are different in kind.
*Danculovich,* 593 P.2d at 193 (citation omitted).  What distinguishes the two is an actor's
state of mind.  Put most succinctly, in order to prove willful misconduct, a plaintiff must
demonstrate that a defendant "acted with a state of mind that approaches intent to do harm."

*Bryant v. Hornbuckle*, 728 P.2d 1132, 1136 (Wyo. 1986) (citation omitted) (emphasis added).

As a result, punitive damage awards are most frequently associated with intentional torts. Although it might be instructive to consider analogous cases where courts ruled that punitive damages were not recoverable as a matter of law, it may be more instructive to consider two of the very few where the issue of punitive damages was submitted to a jury. Both involved far more egregious misconduct that that alleged here.

In *Danculovich, supra,* the estate of a deceased passenger brought a wrongful death action against the driver of a vehicle involved in a single-car accident. Prior to the accident, the defendant drove around town drinking beer, and his blood alcohol level was .12 at the time of the accident. In addition, the defendant was traveling at least 20 MPH over the speed limit, passed another vehicle in a no-passing zone immediately before the accident, and caused the accident by failing to negotiate a simple five-degree turn. *Danculovich,* 593 P.2d at 191. Based collectively upon these facts, all of which were violations of statutory duties, the Wyoming Supreme Court concluded that the jury was entitled to consider whether the defendant acted willfully and wantonly.

In *Coulthard v. Cossairt,* 803 P.2d 86 (Wyo. 1990), overruled on other grounds by *Vaughn v. State,* 962 P.2d 149 (Wyo. 1998), and although it was not the issue on appeal, the trial court submitted the issue of punitive damages to the jury. The jury found

the defendant driver liable for willful and wanton misconduct (and awarded punitive damages) where that driver

- smoked marijuana and drank whiskey

- drank while driving to the "party site"

- drank "at least eight cans of beer and a fifth of whiskey" by the time they arrived at the fishing area

- was "obviously intoxicated"

- rejected one passenger's plea that he (the driver) not drive because of his intoxication. and "pulled that passenger from [his] seat and threw him in the back of the truck"

- drove "40 miles per hour on a curvy. washboarded gravel road, which scared" the three men riding in the back of the pickup

- disregarded those passengers' pleas for him to stop the truck, and

- then "became airborne as [the truck] went off the road."

*Coulthard.* 803 P.2d at 89.

These facts supported the jury's finding of willful and wanton misconduct. *Id.* Nothing in the case at bar remotely resembles Max Coulthard's egregious conduct or the conduct present in *Danculovich.*

This Court granted partial summary judgment to drilling contractor Helmerich & Payne ("H&P") International Drilling Company on a decedent's claim for punitive damages (willful and wanton misconduct) in the case of *Montoya v. Helmerich & Payne International Drilling Company.* No. 03-CV-164J (December 2004). (*See* Order

Granting Defendant Helmerich & Payne International Drilling Co.'s Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages.) That case arose out of a drilling rig accident near Pinedale. Wyoming.  Harvey Montoya. Jr., the decedent, was working as a case stabber for his employer, Central Valley Tongs (CVT) on an H&P drilling rig.  Montoya's employer, CVT, and H&P were both subcontractors of Shell Exploration and Production Company, the owner/operator of the gas well.  Montoya was working as a casing stabber for CVT on an H&P flex drilling rig.  While running the 22nd joint of casing, the traveling block and fill-up contacted and lifted Montoya's stabbing basket, pulling him against his safety harness attached to the rig, and caused a fatal laceration of his lung.

In that case. Plaintiff alleged that:

- H&P designed and constructed a rig with limited visibility;

- H&P failed to repair an intercom system necessary for the safe operation of the rig:

- H&P failed to provide a spotter to observe the movement of men and equipment:

- H&P violated it's own safety regulations ;

- H&P's driller operated the equipment at a speed too high for close clearances;

- H&P failed to obtain a Job Safety Analysis .

This Court correctly granted partial summary judgment in favor of an admittedly negligent drilling contractor.

> This is not a case such as *Danculovich* where the cumulated negligence of the defendant was determined to support a finding of willfulness or wantonness. What does appear here is a confluence of the ordinary negligence of numerous individuals and entities, including [plaintiff] himself, which resulted in the unfortunate and tragic accident of August 6, 2002. **In order to maintain a punitive damages claim in this case, the plaintiff must establish that defendant H&P's conduct was outrageous, reckless, wanton, or willful and must demonstrate a state of mind approaching an intent to do harm. Such conduct must involve some element of outrage similar to that usually found in crime.** Plaintiff has failed to establish such evidence.

*Id.* at 28-29 (emphasis supplied).

Schlossberg interpreted the Orders of the Family Court to give him authority to seize assets of Michael Palencar as well as Teton. All of the assets seized by Schlossberg were titled either in the name of Palencar or in the name of Teton. Schlossberg accounted to the Family Court for all assets he seized. In accordance with the Order of the Family Court, Schlossberg liquidated those assets and paid to Palencar, through Palencar's attorney that money less court approved fees and expenses. Palencar then took that money and spent it for his own personal use without informing anyone at Teton. There may have been conduct that could be considered outrageous, but it was not the conduct of Schlossberg. Plaintiff's claim for punitive damages should be dismissed.

Dated:  9 July 2009.

ROGER SCHLOSSBERG, Defendant

BY: _____

GARY R. SCOTT. #5-1939
HIRST APPLEGATE. LLP
Attorneys for Defendant
1720 Carey Avenue. Suite 200
P. O. Box 1083
Cheyenne, WY  82003
(307-632-0541

### CERTIFICATE OF SERVICE

I certify the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure on 9 July 2009, and that copies were served as follows:

C. M. Aron                                    [    ] U.S. MAIL
Aron and Henning, LLP                         [    ] FED EX
1472 North 5th Street, Suite 201              [    ] FAX
Laramie, WY 82072                             [    ] HAND DELIVERED
                                              [ ✓  ] ELECTRONIC MAIL

_____
OF HIRST APPLEGATE, LLP
Attorneys for Defendant

HIRST APPLEGATE, LLP
LAW OFFICES
1720 CAREY AVENUE. SUITE 200
P.O. BOX 1083
CHEYENNE, WYOMING 82003-1083